# MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Apr 05 2018, 8:07 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Benjamin Loheide
Law Office of Benjamin Loheide
Columbus, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill., Jr.
Attorney General of Indiana

Robert J. Henke
Abigail R. Recker
Deputy Attorneys General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| In the Matter of the Termination of the Parent-Child Relationship of A.P., Mother, and J.P., Minor Child, | April 5, 2018 |
| A.P., | Court of Appeals Case No. 40A01-1708-JT-2034 |
| *Appellant-Respondent,* | Appeal from the Jennings Circuit Court |
| v. | The Honorable Alison T. Frazier, Senior Judge |
| Indiana Department of Child Services, | Trial Court Cause No. 40C01-1602-JT-22 |
| *Appellee-Petitioner.* | |

**Kirsch, Judge.**

[1] A.P. ("Mother") appeals the juvenile court's order terminating her parental rights to her minor child, J.P. ("Child"). Mother raises one issue on appeal, which we restate as whether the juvenile court's judgment terminating her parental rights to Child was clearly erroneous.

[2] We affirm.

## Facts and Procedural History

[3] Mother and J.T. ("Father") are the biological parents of Child, who was born in June 2011. Child lived with Mother for approximately one year before he was removed and adjudicated to be a child in need of services ("CHINS") in September 2012. In September 2013, that CHINS case was closed, and custody was granted to Father.

[4] On May 15, 2014, Indiana Department of Child Services ("DCS") received a report of domestic violence occurring between Father and his then-wife ("Stepmother"), and Child was removed from Father's home; Mother was incarcerated at the time.[1] On May 19, 2014, DCS filed a CHINS petition, alleging, in part, that Father engaged in domestic violence against Stepmother in front of Child and other children in the home and that "[Mother] is currently incarcerated [and] . . . has a history of substance abuse and instability that has

---

[1] In November 2013, Mother was charged with two counts of Class A misdemeanor intimidation, Class B misdemeanor disorderly conduct, and Class B misdemeanor public intoxication endangering a person's life. In February 2014, Mother pleaded guilty to one of the intimidation charges and the public intoxication charge, and she was sentenced to 545 days in jail, with 541 days suspended to probation. *DCS Ex*. 3. Subsequently, the State filed a number of petitions to revoke probation, in April 2014, August 2014, December 2014, and April 2015, which were granted and resulted in various periods of confinement. *Id*.

led to previous DCS involvement and loss of custody and visitation with this [C]hild and current DCS involvement with another child in Bartholomew County" and that "[b]ecause of [Mother's] incarceration, substance abuse and instability, she is unable to properly care for and protect her child." *DCS Exs.* 1A, 1B. At the initial hearing, Mother admitted that she was incarcerated and unable to care for Child.

By July 11, 2014, Mother had been released from jail, and she completed an intake assessment at LifeSpring Health Systems and began therapy there. Mother was also referred to Centerstone, a provider offering mental health services and substance abuse treatment, and, in October 2014, Mother began seeing a family support specialist there. The goals of her treatment were to help Mother with life skills, such as coping and parenting skills, and Centerstone personnel also supervised visits between Mother and Child.

In October 2014, following a fact-finding hearing, the juvenile court adjudicated Child as a CHINS. In November 2014, after a dispositional hearing, the juvenile court issued an order of participation that, among other things, required Mother to do the following: (1) maintain weekly contact with the family case manager ("FCM"); (2) notify the FCM of any arrest or criminal charges for any household member within five calendar days; (3) obtain suitable housing with adequate bedding and food supplies; (4) refrain from using illegal substances and alcohol; (5) submit to random drug screens with negative results for illegal substances; (6) provide Child with a safe, secure, nurturing environment that is free from abuse and neglect; (7) attend all scheduled

visitations with Child and comply with all visitation rules and procedures; (8) comply with home-based counseling. *DCS Exs.* 1E, 1F.

[7]     In March 2015, the State filed new charges against Mother in Jennings County, including: Level 6 felony battery against a public safety officer; Level 6 felony intimidation; Level 6 felony intimidation where threat is to commit forcible felony; Class A misdemeanor resisting law enforcement; and Class B misdemeanor public intoxication endangering his/her life. *DCS Ex.* 4A. Mother pleaded guilty to the two counts of Level 6 felony intimidation, and, on January 8, 2016, Mother was sentenced to the Jennings County Jail for 180 days with credit for 64 days. *Id.* Beginning on January 15, 2016, Mother was to serve her sentence on the weekends in the Jennings County Jail. *Id.*; *DCS Ex.* 4B.

[8]     Following an October 2015 review hearing, the juvenile court issued an order determining that Mother had participated in services but "has not been able to demonstrate any progress or benefit from those services[,]" and the juvenile court changed the permanency plan from reunification to adoption. *DCS Ex.* 1I. On February 16, 2016, DCS filed a petition to terminate the parental rights of Mother and Father.[2] Thereafter, on July 7, 2016, Mother was arrested on a warrant for failing to serve her weekend time in the Jennings County Jail. *DCS Ex.* 4C. Mother was ordered to serve the entire 180 days with credit for the

---

[2] Sometime after Indiana Department of Child Services filed its petition for termination of parental rights against both parents, Father signed a consent for Child to be adopted by his foster parents, and Father does not participate in this appeal. *Appellant's App. Vol. 2* at 28; *Tr. Vol. 2* at 4.

original 64 actual days. *Id.* The juvenile court's order in September 2016, following a review hearing, determined that Mother had not complied with DCS's case plan for Child, had not enhanced her ability to fulfill her parental obligations, and her whereabouts were "unknown." *DCS Ex.* 1K.

[9] On May 17, 2017, the juvenile court held a fact-finding hearing on the termination petition. DCS first called as a witness Kristen Iseler ("Iseler"), an individual counselor at Greenbriar Professionals, a private counseling practice. Upon DCS's referral, Iseler provided individual therapy to Child beginning in April 2016. Child "showed a lot of aggression, defiance, not following rules, not respecting authority and would get into physical altercations with peers." *Tr. Vol. 2* at 8-9. Iseler diagnosed Child with Oppositional Defiant Disorder, and she provided treatment to increase coping skills and anger awareness. On August 17, 2016, Iseler stopped providing Child treatment because she was unable to see Child on a consistent basis due to conflicts with his school schedule and available transportation, but she recommended that Child "definitely" continue therapy. *Id.* at 11. Iseler testified Child needs "a stable consistent safe environment that's able to nurture, address his needs and provide appropriate discipline." *Id.* She testified that Child is "extremely" bonded to his foster parents. *Id.* at 10.

[10] DCS called Mother to testify. At that time, Mother was on work release through Bartholomew County, and prior to that, she had been incarcerated for six months for attempted fraud and possession of methamphetamine. *Tr. Vol. 2* at 18, 77. She acknowledged that she had been incarcerated four or five times

since Child's removal in May 2014. Mother testified that she has another child who has been adopted after she "signed over [her] rights willingly." *Id*. at 16. She also acknowledged that there had been a prior CHINS case involving Child that concluded with Father taking custody of Child. The State inquired about Mother's relationship with Father and related domestic abuse, and she stated that, in 2016, Father broke her nose and that she was pursuing dissolution of marriage from him and has a protective order against him.

[11] Beth Mink ("Mink"), who provided family support services to Mother at Centerstone between approximately October 2014 and October 2015, testified to working with Mother on coping skills, parenting skills, and supervising visitation. Mother's attendance at life skills sessions was "very sporadic" and sometimes, because Mink knew from Mother's admissions that she was "involved in dangerous situations," Mink would sometimes go looking for Mother. *Id*. at 27. Mink explained that by "dangerous situations" she was referring to involvement with drugs and domestic violence. Mink considered Mother "transient" and without a home for the year that she worked with her. *Id*. at 28. Mink described that Mother "did try" with her life skills curriculum, but she "was not able to" make progress, which Mink attributed in part to her environment, which she did not take steps to remove herself from. *Id*. at 29. During visitation, there were times when Mother would attend consistently, and other times she would miss a couple of months at a time, noting that Mother was incarcerated during some of the times that visits were missed, but not during all of the missed visits. *Id*. at 29-31. Mink testified that, during the

visits, Mother struggled with discipline. Mink expressed her belief that Mother loved Child but continued to make negative lifestyle choices. *Id*. at 35.

[12] Alice Maynor ("Maynor"), a licensed clinical social worker with LifeSpring Health Systems ("LifeSpring"), testified next. Mother had been referred by DCS to complete a 30-day inpatient substance abuse program. During the July 2014 intake, Mother reported that she had a learning disability, was dependent on methamphetamine, and her partner was physically and verbally abusive towards her. *Id*. at 39-40. While at LifeSpring, Mother also completed a domestic violence assessment. Maynor testified that Mother "went to groups and completed all of her work," but did not appear to "understand the severity of returning to an active user that was abusive." *Id*. at 41. Mother was successfully discharged from LifeSpring on August 7, 2014. Upon Mother's discharge, it was recommended that, among other things, she obtain independent housing away from Father and that she participate in weekly therapy. However, Mother planned to continue living with Father, and Maynor "absolutely" had concerns about Mother's well-being upon discharge. *Id*. at 42.

[13] Lastly, DCS called as a witness FCM Michelle Shepherd ("FCM Shepherd"), who had been working with the family since January 2016. Among other things, FCM Shepherd testified that Mother failed to comply with her mental health needs, she failed to maintain consistent contact with DCS, and she did not maintain stable housing. *Id*. at 51-52, 56-57. Mother was ordered to contact the FCM on a weekly basis, but of the 156 weeks that the CHINS case

was pending, Mother only initiated ten contacts with DCS. *Id*. at 51. Mother failed to notify DCS of her arrests, she did not comply with home-based counseling, and she did not maintain suitable housing. *Id*. at 51-52. Mother did not refrain from consuming illegal substances and alcohol, as evidenced by her six failed drug screens, which occurred after she was discharged from Life Spring. *Id*. at 55. FCM Shepherd also stated that Mother attempted to implement the parenting skills taught to her, but visitation with Child was eventually suspended due to the inconsistency in her attendance and because it had been almost a year since Mother had seen Child. *Id*. at 56-57, 70. FCM Shepherd said that Mother also did not take care of her own medical and mental health needs, despite FCM Shepherd's efforts to get Mother to do so. With regard to domestic violence, FCM Shepherd testified that, although Mother was seeking dissolution from Father, those efforts did not resolve her domestic violence concerns, as FCM Shepherd believed Mother still need some type of anger management or domestic violence treatment. *Id*. at 66-67.

[14] According to FCM Shepherd, Child was never returned to Mother's care because of her inability to maintain stable housing or rehabilitate herself to the point where she could be trusted to safely supervise Child. *Id*. at 58. When asked if she thought additional time would help, FCM Shepherd replied, "I do not believe any amount of time will actually make [Mother] into a safe sustainable parent for [Child.]" *Id*. at 59. At the time of the termination hearing, Child had been in his pre-adoptive foster home for three years and was doing well in his placement. *Id*. at 58-59. FCM Shepherd opined that

termination of Mother's parental rights was in Child's best interests. *Id.* at 60. DCS's plan for Child upon the termination of Mother's parental rights was adoption by the foster parents. *Id.* at 59.

[15] Mother testified in her defense. She testified to her visitations with Child, her desire to see him, and her attempts to work on her parenting skills. She explained that from August 2016 to February 2017, she was in the Bartholomew County Jail for attempted fraud and possession of methamphetamine, was currently in work release working approximately twenty-three hours per week, and expected to be released to probation in August 2017. She acknowledged her struggles with drug addiction and stated that, to address that, she had been voluntarily participating in services at Centerstone since February 27, 2017. *Id.* at 79. Mother testified to trying to better herself because she did not want that life anymore. *Id.* at 81. She asked the juvenile court for "another chance" as she was voluntarily doing things that she had been told to do before, but was now doing on her own, including attending Alcoholics Anonymous and Narcotics Anonymous, and was not associating with her family or the same people as she had been previously. *Id.* at 82-83, 86.

[16] Mother also called as a witness Valencia Gooden ("Gooden"), a care coordinator and recovery coach at Centerstone. She began treating Mother in February 2017, as a referral from the Bartholomew County probation department, and worked with Mother on recovery management, relapse prevention, and life skills. She characterized Mother as "doing really great"

and believed that Mother seems motivated to make improvements in her life. *Id*. at 89. Gooden stated that there would be eight weeks of aftercare, to help with transitional housing and employment and continued recovery. Gooden was not able to give an estimate of how long it might take for Mother to be able to live independently.

[17] On August 2, 2017, the juvenile court entered an order terminating Mother's parental rights to Child ("Order"), which included findings of fact and conclusions of law. *Appellant's App. Vol. 2* at 27-35. Among its findings were:

> 18. Mother failed to maintain weekly contact with her Family Case Manager. Mother contacted the FCM, Michelle Shepherd, only 10 weeks of the 156 weeks that the case had been open.
>
> 19. Mother failed to notify the DCS of arrests. During the course of the CHINS, Mother was arrested at least 5 times, and incarcerated 4-5 times on charges of attempted fraud, possession of methamphetamine, battery on a law enforcement officer, resisting law enforcement, and intimidation.
>
> 21. Mother failed to maintain suitable housing. She was incarcerated multiple times--during the course of the CHINS case, and was homeless for periods of time when not incarcerated. She also resumed her relationship with Father for a time, and resided with him in a domestically violent relationship.
>
> 23. Mother failed to maintain sobriety, consuming both illegal drugs and alcohol during the case. FCM Shepherd administered several drug screens to Mother, 6 of which returned positive results for methamphetamine and/or THC, while 2 were negative. One of Mother's arrests during the case resulted in charges of blood alcohol content 0.1 or above.

29. Mother admits she has a drug addiction. In the three months prior to the termination hearing, Mother had been participating in substance abuse treatment through the jail and had been providing clean drug screens through her program.

33. Mother failed to comply with home-based counseling.

34. Mother failed to meaningfully follow the recommendations of her parenting assessment. One of the recommendations was to maintain a sober lifestyle.

36. Mother missed approximately one-half of her scheduled visits with the [C]hild, and when she did attend visits, lacked the tools to parent appropriately.

53. Mother's effort to extricate herself from her violent relationship with Father only occurred after the Court changed the minor [C]hild's case plan to adoption. The end of one domestically violent relationship does not necessarily alleviate the underlying issue. Mother continues to have anger and domestic violence issues of her own that remained unaddressed at the time of the termination hearing.

*Id*. at 30-33.

[18]     The juvenile court concluded, in part:

57. Mother did not successfully remedy the reasons for which the minor [C]hild was removed from her care and therefore, the minor [C]hild was never returned to her care. Mother was incarcerated at the inception of the CHINS case, and after being released and re-incarcerated several times throughout the course of the CHINS, she was again incarcerated at the time of the termination hearing.

58.  Mother did not successfully remedy the reasons for continued placement of the minor [C]hild outside of her care. Throughout the life of the case, Mother has failed to address her substance abuse, domestic violence, and mental health issues and has had only sporadic contact with the minor [C]hild.  Mother last saw the minor child one year prior to the termination hearing.

*Id*. at 34.  It also concluded that there was a reasonable likelihood that the continuation of the parent-child relationship posed a threat to the Child, termination of parental rights was in Child's best interests, and there was a satisfactory plan for the care and treatment of Child.  *Id*.  Mother now appeals.

## Discussion and Decision

[19]     As our Supreme Court has observed, "Decisions to terminate parental rights are among the most difficult our trial courts are called upon to make.  They are also among the most fact-sensitive—so we review them with great deference to the trial courts[.]"  *E.M. v. Ind. Dep't of Child Servs.*, 4 N.E.3d 636, 640 (Ind. 2014). While the Fourteenth Amendment to the United States Constitution protects the traditional right of a parent to establish a home and raise his child, and thus parental rights are of a constitutional dimension, the law allows for the termination of those rights when a parent is unable or unwilling to meet his responsibility as a parent. *Bester v. Lake Cnty. Office of Family & Children,* 839 N.E.2d 143, 145 (Ind. 2005); *In re T.F.,* 743 N.E.2d 766, 773 (Ind. Ct. App. 2001), *trans. denied.*  That is, parental rights are not absolute and must be subordinated to the child's interests in determining the appropriate disposition of a petition to terminate the parent-child relationship.  *In re J.C.*, 994 N.E.2d

278, 283 (Ind. Ct. App. 2013). The purpose of terminating parental rights is not to punish the parent but to protect the child. *In re T.F.*, 743 N.E.2d at 773. Termination of parental rights is proper where the child's emotional and physical development is threatened. *Id.* The juvenile court need not wait until the child is irreversibly harmed such that his physical, mental, and social development is permanently impaired before terminating the parent-child relationship. *Id.*

[20] When reviewing a termination of parental rights case, we will not reweigh the evidence or judge the credibility of the witnesses. *In re H.L.*, 915 N.E.2d 145, 149 (Ind. Ct. App. 2009). Instead, we consider only the evidence and reasonable inferences that are most favorable to the judgment. *Id.* Moreover, in deference to the trial court's unique position to assess the evidence, we will set aside the court's judgment terminating a parent-child relationship only if it is clearly erroneous. *Id.* at 148-49. A judgment is clearly erroneous only if the legal conclusions made by the juvenile court are not supported by its findings of fact, or the conclusions do not support the judgment. *In re S.P.H.*, 806 N.E.2d 874, 879 (Ind. Ct. App. 2004).

[21] Where, as here, the juvenile court entered specific findings and conclusions, we apply a two-tiered standard of review. *In re B.J.*, 879 N.E.2d 7, 14 (Ind. Ct. App. 2008), *trans. denied*. First, we determine whether the evidence supports the findings, and second, we determine whether the findings support the judgment. *Id.* A finding is clearly erroneous only when the record contains no facts or inferences drawn therefrom that support it. *Id.* If the evidence and inferences

support the trial court's decision, we must affirm. *A.D.S. v. Ind. Dep't of Child Servs.*, 987 N.E.2d 1150, 1156 (Ind. Ct. App. 2013), *trans. denied.*

[22] Before an involuntary termination of parental rights may occur, the State is required to allege and prove, among other things:

> (B)  that one (1) of the following is true:
>
> (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
>
> (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
>
> (iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;
>
> (C)  that termination is in the best interests of the child; and
>
> (D)  that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2).  The State's burden of proof for establishing these allegations in termination cases "is one of 'clear and convincing evidence.'"  *In re H.L.*, 915 N.E.2d at 149.  Moreover, if the court finds that the allegations in a petition described in section 4 of this chapter are true, the court *shall* terminate the parent-child relationship.  Ind. Code § 31-35-2-8(a) (emphasis added).

[23] Mother does not specify which of the statutory elements that she believes DCS failed to satisfy. However, her argument is that she "had already begun to remedy the conditions and/or issues that were present in the beginning of the case, and would likely continue to do so," *Appellant's Br.* at 11, and thus she appears to be challenging the juvenile court's determination that there was a reasonable probability that the conditions that resulted in the Child being removed or the reasons for Child's placement outside the home would not be remedied.[3]

### Remediation of Conditions

[24] In determining whether there is a reasonable probability that the conditions that led to a child's removal and continued placement outside the home would not be remedied, we engage in a two-step analysis. *K.T.K. v. Ind. Dep't of Child Servs.*, 989 N.E.2d 1225, 1231 (Ind. 2013). First, we must ascertain what conditions led to the child's placement and retention in foster care, and, second, we determine whether there is a reasonable probability that those conditions will not be remedied. *Id.* In the second step, the trial court must judge a parent's fitness at the time of the termination proceeding, taking into consideration evidence of changed conditions and balancing a parent's recent improvements against "'habitual pattern[s] of conduct to determine whether

---

[3] Mother presents no argument disputing that (1) the continuation of the parent-child relationship posed a threat to Child's well-being, (2) there was a satisfactory plan for Child, or (3) termination was in Child's best interests. Accordingly, she has waived any challenge to the juvenile court's determination on those elements of the termination statute. Ind. Appellate Rule 46(A)(8).

there is a substantial probability of future neglect or deprivation.'" *E.M.*, 4 N.E.3d at 643 (quoting *K.T.K.*, 989 N.E.2d at 1231). Pursuant to this rule, "trial courts have properly considered evidence of a parent's prior criminal history, drug and alcohol abuse, history of neglect, failure to provide support, and lack of adequate housing and employment." *A.F. v. Marion Cnty. Office of Family & Children*, 762 N.E.2d 1244, 1251 (Ind. Ct. App. 2002), *trans. denied*. In addition, DCS need not provide evidence ruling out all possibilities of change; rather, it need establish only that there is a reasonable probability the parent's behavior will not change. *In re Involuntary Termination of Parent-Child Relationship of Kay L.*, 867 N.E.2d 236, 242 (Ind. Ct. App. 2007). "We entrust that delicate balance to the trial court, which has discretion to weigh a parent's prior history more heavily than efforts made only shortly before termination." *E.M.,* 4 N.E.3d at 643. We have recognized, "Even assuming that [the parent] will eventually develop into a suitable parent, we must ask how much longer [the child] should have to wait to enjoy the permanency that is essential to [his] development and overall well-being." *Castro v. State Office of Family & Children,* 842 N.E.2d 367, 375 (Ind. Ct. App. 2006), *trans. denied.*

[25] We note that, in claiming that the evidence was insufficient to support the juvenile court's order terminating his parental rights, Mother does not challenge the sufficiency of the evidence to support any of the juvenile court's findings. As a result, Mother has waived any argument relating to whether these unchallenged findings are clearly erroneous. *See In re Involuntary Termination of Parent-Child Relationship of B.R.*, 875 N.E.2d 369, 373 (Ind. Ct. App. 2007)

(providing that failure to challenge findings resulted in waiver of argument that findings were clearly erroneous), *trans. denied*. Therefore, on review, we must determine whether these unchallenged findings are sufficient to support the juvenile court's conclusion that the conditions that led to Child's removal from and continued placement outside Mother's care would not be remedied. We conclude that they are.

[26] Here, Mother acknowledges that Child lived with her for approximately the first year of his life, but not thereafter, living with Father until he was removed in May 2014 and then in his current foster care placement since August 2014. She also acknowledges that, during the course of these proceedings, she used methamphetamine and marijuana, was arrested a number of times, including an arrest after completing a substance abuse program in 2014, and was sometimes incarcerated and sometimes homeless. *Appellant's Br.* at 5. Mother argues, however, that evidence presented showed that she "had already begun to remedy the conditions and/or issues that were present in the beginning of the case, and would likely continue to do so." *Id.* at 11.

[27] Specifically, Mother highlights that, prior to the termination hearing, she was in a drug addiction treatment program and had passed her six or seven most recent drug screens, and her counselor testified that Mother was putting efforts into skills and recovery. The counselor also testified that, after Mother was released from incarceration, there would be services available to Mother to help her with finding a residence and employment and to continue with drug addiction treatment. Therefore, Mother contends that the juvenile court "did

not properly focus on [Mother]'s progress in the months preceding the fact-finding hearing." *Id.* at 10.

[28] While Mother may have been making some progress "in the months preceding the fact-finding hearing," the juvenile court was not required to only consider recent improvement. *In re E.M.,* 4 N.E.3d at 643 (trial court has discretion to weigh a parent's prior history more heavily than efforts made only shortly before termination). Although trial courts are required to give due regard to changed conditions, this does not preclude them from finding that a parent's past behavior is the best predictor of their future behavior. *Id.*

[29] The record in this case reveals that, since the May 2014 removal, Child was never returned to Mother's care, and before that, she was the non-custodial parent pursuant to a removal in the prior CHINS case. That is, Child has resided with Mother for approximately one year of his six years. He has resided in his current foster home for almost three years, since August 2014, and is doing extremely well. Mother was arrested at least four times during the pendency of the case, including for possession of methamphetamine. She did not consistently report to her FCM, she did not report her arrests, she did not maintain stable housing, and she did not refrain from using drugs and alcohol. We recognize that, in the months prior to the hearing, and while on work release, Mother has pursued efforts to improve her lifestyle and environment. The juvenile court was tasked with balancing her recent efforts with her prior history to determine whether termination of Mother's parental rights was in Child's best interests, and based on the record before us, we cannot say that the

juvenile court clearly erred in concluding that there is a reasonable probability that the conditions that resulted in Child's removal and continued placement outside the home will not be remedied.

[30] Affirmed.

Baker, J., and Bradford, J., concur.